[Doc. Nos. 10, 11]

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

RICHARD A. THOMAS,                      :
                                        :
              PLAINTIFF,                :
                                        :
       v.                               :        **Civil No. 10-5514 (JS)**
                                        :
DELAWARE RIVER                          :
PORT AUTHORITY (DRPA), et al.,          :
                                        :
              DEFENDANTS.               :
_____       :

### <u>MEMORANDUM OPINION</u>

### I

  This matter is before the Court on the "Motion for Summary Judgment" [Doc. No. 10] ("Motion") filed by defendants Delaware River Port Authority ("DRPA") and Patrolman Robert Sexton ("Sexton") (collectively, "defendants"), and the "Cross Motion for Partial Summary Judgment on Liability" [Doc. No. 11] ("Cross Motion") filed by plaintiff Richard A. Thomas ("plaintiff").[1]  Plaintiff alleges false arrest against Sexton and municipal liability pursuant to an unconstitutional policy or custom against the DRPA, all pursuant to 42 U.S.C. § 1983.  [Doc. No. 1-1 at 10-15] ("Complaint").[2]  Plaintiff's claims arise from an incident in which plaintiff was handcuffed and transported to DRPA headquarters as part of an investigation regarding the validity of his New Jersey Permit to Carry a Handgun ("NJ Permit").  Defendants raise four

---

[1]The parties consented to the jurisdiction of this Court to decide the motion.  28 U.S.C. § 636(c).

[2]In his Complaint, plaintiff also raised a claim of municipal liability against the DRPA for a failure to train.  At oral argument, plaintiff withdrew this claim.

arguments in their motion.  First, defendants argue that plaintiff's handcuffing constituted a detention supported by reasonable suspicion.  Brief in Support of Defendants' Motion for Summary Judgment at 10-12 ("Defs.' Brief").  Second, if the Court treats plaintiff's handcuffing as an arrest, defendants argue Sexton possessed probable cause.  (Defs.' Brief at 12-16).  Third, defendants argue Sexton's actions were protected by qualified immunity.  (Id. at 16-19).  Last, defendants argue that no evidence exists to support plaintiff's claim of municipal liability.  (Id. at 20).

In his "Brief in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross Motion for Partial Summary Judgment on Liability" ("Pl.'s Brief"), plaintiff challenges all arguments raised by defendants.  Plaintiff first argues he was arrested without probable cause.  (Pl.'s Brief at 14-23).  Plaintiff further argues that Sexton is not entitled to qualified immunity or, alternatively, that a question of fact exists as to the availability of qualified immunity.  (Id. at 25-28).  Plaintiff further argues the DRPA is not entitled to summary judgment on the issue of municipal liability, because Sexton's deposition testimony reveals the existence of "established protocol," and a jury should determine whether a custom or policy was the proximate cause of his alleged injuries.  (Id. at 28-29).  Last, plaintiff argues he is entitled to summary judgment on the issue of Sexton's liability for unlawful arrest, because the record before the Court is "undisputed."  (Id. at 29-31).

This Court recently heard oral argument.  For the following reasons, defendants' motion is GRANTED IN PART and DENIED IN PART, and plaintiff's cross motion is DENIED.

**II**

A summary of the facts in the light most favorable to plaintiff follows.  At the time of the events giving rise to this action, plaintiff worked for Wackenhut G4S Solutions ("Wackenhut"), a private security firm operating in Pennsylvania and New Jersey, among other locations.  (Id. 17:25; 18:20-21).  Plaintiff was employed by Wackenhut as a "Customs Protection Officer," and worked as a security guard at the Liberty Bell Pavilion and the Independence Hall complex in Philadelphia, Pennsylvania.  (Id. 18:4-13).

Wackenhut issued plaintiff a Smith & Wesson .38 wheel gun revolver ("firearm"), which he carried as part of his employment.  (Id. 23:2-15).  Wackenhut did not provide storage facilities for plaintiff's firearm.  (Id. 25:18-26:1).  Instead, plaintiff carried the firearm with him on his daily commute from Westmont, New Jersey to Philadelphia on the Port Authority Transit Corporation ("PATCO") high-speed commuter line.  (Id. 23:23-24:5).  During these commutes, plaintiff carried the firearm in a holster that he wore on his right hip, over his clothing.  (Id. 24:6-22).  The firearm was visible to others at all times.  (Id. 24:21-22).

On May 28, 2010, plaintiff ended his shift at the Independence Hall complex at 4:15 in the afternoon.  (Id. 25:1-10).  He gathered his belongings, left the building, and walked directly from 6th Street to the corner of 8th and Market Streets, where a PATCO station is located.  (Id. 25:12-17, 26:8-13).  Plaintiff walked to the PATCO station in his security guard uniform:  a tan outfit with purple stripes and an insignia that read "Wackenhut."  (See Incident Report; Sexton Dep. Tr. 22:3-6).  As on prior commutes, plaintiff traveled with his firearm in a holster on his hip, in a position that would have been visible to others.  (Pl.'s Dep. Tr. 26:2-7).  At the PATCO station, plaintiff waited on the platform for approximately 12-13 minutes before boarding a train

3

to Westmont.  (Id 26:14-25).  At all times, the firearm remained in a holster on plaintiff's hip, in a position visible to others on the train.  (See id. 26:17-22).

When plaintiff arrived in Westmont, he exited the train and walked towards the parking lot of the station.  (Id. 27:4-15).  Plaintiff recalls stopping briefly to say hello to two individuals whom he recognized.  (Id. 27:16-24).  While speaking with these individuals, plaintiff was approached by Sexton.  (Id. 27:22-28:9).

When Sexton first observed plaintiff, he noted that plaintiff was wearing a uniform, tan in color, with purple stripes.  (Id. 21:4-14; Incident Report).  As Sexton approached plaintiff, he saw the holstered firearm on his hip.  (Incident Report).[3]  He also noticed the "Wackenhut" insignia.  (Sexton Dep. Tr. 22:5).  Sexton admits he was aware that Wackenhut is a private security firm.  (Sexton Dep. Tr. 36:20-25).  Seeing Sexton approach, plaintiff volunteered his NJ Permit, expressing surprise that he had never before been approached regarding his holstered firearm.  (Incident Report; Sexton Dep. Tr. 23:22-24:5; Pl.'s Dep. Tr. 28:17-29:9).  Plaintiff presented Sexton with four documents:

    1) New Jersey Driver's License;
    2) Security Officer's Registration Act Card ("SORA Card");
    3) Permit to Carry a Weapon Pursuant to Pennsylvania Act 235 ("PA Permit"); and
    4) NJ Permit.

(Pl.'s Dep. Tr. 30:1-7).  Plaintiff also identified himself to Sexton as a private security guard working in Philadelphia.  (Sexton Dep. Tr. 24:6-16).

---

[3]Plaintiff asserts Sexton first approached him in Sexton's vehicle, and that he did not leave the vehicle while the two spoke.  (Pl.'s Dep. Tr. 28:10-29:21, 34:12-13).  Sexton, on the other hand, asserts he left his car before initially approaching plaintiff.  (See Sexton Dep. Tr. 21:24).  The difference is not material to the Court's decision.

4

The face of the NJ Permit provides a description of plaintiff, as well as his photograph and a fingerprint taken from his right index finger.  The face also includes the following text:

> Restrictions:  To be carried in connection w/employment as an Armed Security Guard for Wackenhut Serv. Inc.; during working hours only.  If employment should end; permit will expire.

In relevant part, the back of the NJ Permit reads:

> This Certifies [t]hat [plaintiff] . . . has permission to carry a handgun in the State of New Jersey pursuant to 2C:58-4 of the New Jersey Statutes . . . . Restrictions placed on the Permit must be strictly observed.

The back of the NJ Permit is signed by the issuing judge:  the Honorable Samuel D. Natal, J.S.C., of the Superior Court of New Jersey, Camden County.  As of May 28, 2010, the NJ Permit had not expired.

After reviewing plaintiff's documentation, Sexton advised him there was a problem with his NJ Permit.  (Pl.'s Dep. Tr. 32:15-18).  Specifically, Sexton noted that the wording of the permit restricted its use to "working hours only."  At his deposition, Sexton testified plaintiff told him he "was still on duty."  (Sexton Dep. Tr. 26:18).  Plaintiff disputes this assertion, and contends he informed Sexton he had just completed his work day.  (See Pl.'s Dep. Tr. 32:16-19).

While the two parties do not differ substantially on the events that followed, plaintiff and Sexton provide different timelines for what occurred once Sexton expressed concern about the validity of the NJ Permit.  Adopting plaintiff's timeline for the purpose of evaluating defendants' motion, plaintiff first suggested Sexton contact Judge Natal to clarify the terms of the permit's restrictions.  (Pl.'s Dep. Tr. 35:24-36:4).  At the time, plaintiff carried contact information for Judge Natal's chambers.  (Pl.'s Dep. Tr. 36:10-12).  Sexton refused to contact the judge.  (Pl.'s Dep. Tr. 36:3-4; Sexton Dep. Tr. 27: 1-5).  Plaintiff recalls Sexton saying, "I don't work for the

Judge, I work for a corporal." (Pl.'s Dep. Tr. 36:3-4). Sexton testified it was "not protocol" to contact a judge from the scene. (Sexton Dep. Tr. 27:16-19). When asked if there was a written policy prohibiting him from calling the judge, Sexton testified that one did not exist. (Id. at 27:20-21).

After declining to call Judge Natal, Sexton reiterated that plaintiff's NJ Permit stated it was valid "during working hours only." (Pl.'s Dep. Tr. 36:16-18). When plaintiff maintained he had gone off-duty at 4:15 that afternoon, Sexton responded it was uncertain whether plaintiff worked at all that day. (Id. 36:21-25). At some point during this discussion, plaintiff offered to call Marcus Perdue ("Perdue"), a supervisor for Wackenhut working out of its office in Horsham, Pennsylvania. (Id. 41:10-17). Plaintiff called Perdue, who confirmed with Sexton that plaintiff left work at 4:15 that afternoon. (Incident Report; Sexton Dep. Tr. 26:8-10; Pl.'s Dep. Tr. 33:5-7, 37:1-38:7, 41:10-17).

After Perdue confirmed plaintiff's work schedule, plaintiff asked Sexton to use the restroom. (Pl.'s Dep. Tr. 47:6-48:25). Sexton escorted plaintiff to an employee restroom in the Westmont station. (Pl.'s Dep. Tr. 47:17-19). The employee restroom requires a key to enter, but not to exit. (Id. 47:23-48:2). Sexton unlocked the restroom, and plaintiff entered, unaccompanied, to use the facilities. (Id. 48:8-14). While plaintiff used the restroom, Sexton returned to his vehicle. (Id. 48:15-49:1). After plaintiff finished using the restroom, he returned to Sexton's vehicle unaccompanied. (Id.). At all times, plaintiff was in possession of his firearm. (Id. 48:8-9).

While plaintiff was in the restroom, or shortly after he returned, Sexton radioed then-Corporal (now Sergeant) Allison Mankoski ("Cpl. Mankoski") of the DRPA Police Force.

6

(Incident Report); Certification of Allison Mankoski at ¶¶ 1-4 ("Mankoski Cert."); (Pl.'s Dep. Tr. 49:5-7). Cpl. Mankoski advised Sexton to detain plaintiff for further investigation. (Incident Report; Mankoski Cert. at ¶¶ 4-5). Sexton handcuffed plaintiff and placed him in Sexton's vehicle. (Pl.'s Dep. Tr. 41:24-45:2). Sexton disarmed plaintiff, and placed plaintiff's firearm on the passenger seat of his vehicle. (Pl.'s Dep. Tr. 42:24-25). He then searched plaintiff, recovering a pocket knife from plaintiff's back pocket and additional ammunition for the firearm. (Id. at 43:24-44:4; Incident Report). Sexton also recovered plaintiff's wallet and "a couple other things" from plaintiff's pocket. (Pl.'s Dep. Tr. 43:25). Approximately 25 minutes later, after Cpl. Mankoski arrived on the scene, plaintiff was transferred to her vehicle and taken to DRPA headquarters. (Incident Report; Mankoski Cert. at ¶ 8; Sexton Dep. Tr. 29:22-24; Pl.'s Dep. Tr. 45:6-12, 51:8-52:18).

At DRPA headquarters, plaintiff was handcuffed to a bench in the processing room. (Sexton Dep. Tr. 31:22-24; Pl.'s Dep. Tr. 54:16-22). While there, another officer inventoried the contents of plaintiff's wallet. (Pl.'s Dep. Tr. 55:22-56:3). A National Crime Information Center ("NCIC") check confirmed that plaintiff's gun was not reported stolen or missing. (Sexton Dep. Tr. 32:6-17).[4] While the DRPA Police ran the NCIC check, Cpl. Mankoski contacted Judy Berry ("Berry"), the on-call prosecutor at the Camden County Prosecutor's Office. (Incident Report; Mankoski Cert. at ¶ 10). Berry informed Mankoski that, although plaintiff was in violation of the restrictions on his permit, the prosecutor's office declined to prosecute the matter. (Incident Report; Mankoski Cert. at ¶ 11). The DRPA Police released plaintiff and instructed him to

---

[4]While the record is unclear as to when the NCIC check was performed, defendant confirmed at oral argument that the check was not requested at the Westmont train station.

contact Judge Natal to amend the permit.  (Incident Report; Mankoski Cert. at ¶ 13-15).  Plaintiff

was released from DRPA custody at approximately 6:00 p.m. that evening.  (Sexton Dep. Tr.

36:13-19).  An unknown DRPA officer returned plaintiff to the Westmont PATCO station.  (Pl.'s

Dep. Tr. 60:6-22).

On June 10, 2010, Robert K. Uyehara, Jr. ("Uyehara"), Deputy Section Chief of the

Administrative Unit of the Camden County Office of the Prosecutor ("Administrative Unit")

wrote a letter to the Chief of the DRPA Police Department regarding the May 28, 2010 incident.

Certification of David McClintock, Ex. A ("Uyehara Letter").  In his letter, Uyehara identified

the Administrative Unit as responsible for administering carry permit hearings.  (Uyehara Letter

at ¶ 4).  The Administrative Unit declined to seek an amendment to plaintiff's NJ Permit for

three reasons:

> First, Mr. Thomas has a valid Pennsylvania permit to carry a firearm.  Additionally, Mr.
> Thomas is sometimes required to work in Pennsylvania as an armed security officer.
> Finally, in this particular case, Mr. Thomas was stopped approximately 30 minutes after
> [he] concluded working for the day.

(Uyehara Letter at ¶¶ 4-5).  The Administrative Unit concluded that an amendment to the NJ

Permit was not necessary, but also determined that transporting a firearm in a holster was not the

"safest" means, and that "in the future, Mr. Thomas must transport his firearm in a secure case or

gun box from work even on [PATCO]."  (Id. ¶¶ 6, 10).  Regarding the validity of plaintiff's NJ

Permit, the letter noted:

> We understand that this situation was rather confusing to all parties involved, and we
> hope that this letter will clarify the matter . . . .  If Mr. Thomas did not possess a valid
> [PA Permit] or were not coming directly from his place of work in Pennsylvania, he
> would be in clear violation of his limited [NJ Permit] and could have been charged.

(Uyehara Letter at ¶ 9).

8

On August 16, 2010, plaintiff appeared pro se before Judge Natal in the Superior Court of New Jersey, Camden County, for a gun permit hearing.  August 16, 2010 Gun Permit Hearing ("NJ Permit Hearing").  Also appearing were counsel for the DRPA, as well as the State Assistant Prosecutor ("Assistant Prosecutor").  The Assistant Prosecutor represented before the court that the question of plaintiff's ability to carry his firearm on PATCO was resolved and that "both parties agree that [the] permit is now sufficient."  (NJ Permit Hearing Tr. 5:8-9).  The Assistant Prosecutor further represented that "both parties are agreed that [the firearm] can be carried in a holster that's concealed."  (Id. 5:13-14).  The court accepted both representations, then addressed plaintiff:

> THE COURT:  I think where the problem basically started is the letter we originally received from your employer . . . . it says "The applicant's post will include one of several armed contract locations within the State of New Jersey . . . . In other words, they never told anybody that you were going to be in Pennsylvania.  That's where the whole thing started, because – so we never realized it was an issue.  But apparently everything has been resolved.

(NJ Permit Hearing Tr. 5:19-6:8).  There is no indication in the record that the wording of plaintiff's NJ Permit was amended prior to or following the NJ Permit Hearing.

### III

Fed. R. Civ. P. 56(c) provides that a court may grant summary judgment if the pleadings, depositions, answers to interrogatories and admissions show that there is no genuine issue as to any material fact, and if the court determines that the moving party is entitled to judgment as a matter of law.  In reviewing a motion for summary judgment, all facts should be viewed in the light most favorable to the non-moving party.  Marzano v. Computer Sci. Corp., 91 F.3d 497, 501 (3d Cir. 1996).  "[T]he mere existence of some alleged factual dispute between parties will

9

not defeat an otherwise properly supported motion for summary judgment . . . ."  Anderson v.

Liberty Lobby, Inc. ("Anderson"), 477 U.S. 242, 247-48 (1986).  Whether a disputed fact is

material is determined by the substantive law, and only those disputed facts that might affect the

outcome of a case will preclude a grant of summary judgment.  Id. at 248.  A "genuine" issue

exists where a reasonable jury could find in favor of the non-moving party.  Id.  Even where a

court finds no genuine issues of material fact, "summary judgment in favor of the party with the

burden of persuasion . . . is inappropriate when the evidence is susceptible of different

interpretations or inferences by the trier of fact."  Hunt v. Cromartie, 526 U.S. 541, 553 (1999);

Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 744 (3d Cir. 1996); Varriale v.

Borough of Montvale, No. Civ. A. 04-199 (JLL), 2007 WL 928321, at *3 (D.N.J. Mar. 26,

2007).

## IV

### A

The first issue to be addressed is whether plaintiff was "arrested" for purposes of Fourth

Amendment analysis.  Defendants argue that Sexton's questioning of plaintiff constituted an

investigatory stop supported by reasonable suspicion, and that handcuffing plaintiff did not

change the nature of the interaction.  (Defs.' Brief at 11; Reply Brief at 4).  Plaintiff argues his

investigatory stop turned into an arrest because he was "taken into custody in handcuffs, deprived

of his liberty, searched with his wallet contents examined, and later handcuffed to a bench."

(Pl.'s Brief at 14).  Accordingly, plaintiff contends Sexton must demonstrate probable cause to

satisfy the requirements of the Fourth Amendment.  (Id. at 15) (citing Dunaway v. New York,

442 U.S. 200, 212 (1979)).

"An officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000).  When making an investigatory stop, police officers "may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" U.S. v. Edwards, 53 F.3d 616, 619 (3d Cir. 1995) (quoting U.S. v. Hensley, 469 U.S. 221, 235 (1985)).  Merely handcuffing an individual while securing a location or conducting an investigation does not automatically transform an investigatory stop into an arrest.  U.S. v. Johnson, 592 F.3d 442, 448 (3d Cir. 2010); Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995) ("There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest.").  However, "the use of guns and handcuffs must be justified by the circumstances." Baker, 50 F.3d at 1193.  "The reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect." Id. at 1192.

As articulated by the Supreme Court in Terry v. Ohio, 392 U.S. 1, 24 (1968), an officer is justified in taking "necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm," if he believes a suspect "is armed and presently dangerous to the officer or to others."  "The test [for a Terry stop] is 'whether a reasonably prudent man [or woman] in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" U.S. v. Kithcart, 134 F.3d 529, 532 (3d Cir. 1993) (quoting Terry, 392 U.S. at 27).  Courts have declined to treat an investigatory stop as an arrest

11

where an officer's actions were necessary to secure the immediate safety of those involved in the investigation.  See Johnson, supra.[5]  However, Terry permits an officer with less than probable cause to intrude into the personal liberty of a suspect only to the extent required to protect himself and to secure the situation.  U.S. v. Myers, 308 F.3d 251, 258 (3d Cir. 2002).  A police officer may not rely on reasonable suspicion to effect a "full search" of an individual, nor may he investigate his suspicions "by means that approach the conditions of arrest."  Florida v. Royer, 460 U.S. 491, 499 (1983); cf. Minnesota v. Dickerson ("Dickerson"), 508 U.S. 366, 373 (1993) (affirming the "strictly limited" scope of protective searches pursuant to Terry).  Ultimately, the determination of whether an investigatory stop is transformed into an arrest is one that requires the application of "common sense and ordinary human experience."  U.S. v. Sharpe, 470 U.S. 675, 685 (1985).

Relying on the material facts not in dispute, the Court finds that plaintiff was arrested for the purpose of its Fourth Amendment analysis, and therefore Sexton must articulate probable cause justifying plaintiff's detention.  The record does not indicate that a "reasonably prudent [person] in the circumstances would have been warranted in the belief that his safety or that of others was in danger."  See Kithcart, 134 F.3d at 532.  When Sexton approached plaintiff, he recognized the insignia on his uniform as belonging to a private security company.  As he approached, plaintiff volunteered his NJ Permit and identification in advance of any questioning.  Plaintiff's documents confirmed his identity and his employment with Wackenhut.  In addition,

---

[5]In Johnson, the Third Circuit found, where officers had reasonable suspicion to believe a defendant was involved in a shooting just prior to the stop, the officers' conduct did not amount to an arrest where they encircled the suspect vehicle, drew their weapons, ordered the vehicle's occupants to exit the vehicle, and handcuffed them.  Johnson, 592 F.3d at 452; see also U.S. v. Coker, 223 Fed. Appx. 136,140-141 (3d Cir. 2007).

Sexton independently confirmed plaintiff's employment with plaintiff's supervisor, who also confirmed that he worked that day.  Although plaintiff was armed, he was cooperative at all times.

After confirming plaintiff's identity and employment, Sexton allowed plaintiff to use the restroom, unaccompanied, while still in possession of his firearm.  Sexton did not secure the firearm before plaintiff entered the restroom; in fact, Sexton returned to his vehicle while the plaintiff remained unsupervised.  Sexton's conduct suggests that, during his investigation, he did not think plaintiff was dangerous, either to himself or to the other commuters at the Westmont PATCO Station.  Sexton's decision to handcuff plaintiff came after he determined that plaintiff was not a safety threat.  Nothing about the circumstances presented to Sexton changed over the course of his investigation in a way requiring the introduction of arrest-like conduct to maintain the status quo.  While plaintiff's handcuffing did not automatically transform his stop into an arrest, it undermines Sexton's argument that his actions were consistent with the intended purpose of Terry.  See 392 U.S. at 23 (citing an officer's "immediate interest" in neutralizing the threat of a suspect's concealed weapon).

Plaintiff's treatment after being handcuffed also demonstrates that he was arrested.  Seizing plaintiff's wallet in this context was unrelated to any risk that plaintiff was armed and presently dangerous, and comes closer to the type of "full search" that requires probable cause.  See Dickerson, 508 U.S. at 378 (associating officer's search of respondent's pocket after determining absence of weapon with evidentiary search barred by Terry).  The inventory of plaintiff's wallet at DRPA headquarters is also consistent with the type of "inventory search" associated with the booking of a suspect who is under arrest.  See, e.g., U.S. v. Yamba, 506 F.3d

251, 254 (3d Cir. 2007).  In addition, when plaintiff was transported to DRPA headquarters,

where he was handcuffed to a bench, he was placed in a situation "sufficiently like arrest" to

require probable cause.  Hayes v. Florida, 470 U.S. 811, 816 (1985); see also id. at 815

("[T]ransportation to and investigative detention at the station house without probable cause or

judicial authorization together violate the Fourth Amendment"); Ukawabutu v. Cathel, C.A. 06-

837 (NLH), 2008 WL 1901004, at *14 (D.N.J. Apr. 24, 2008).

Because there are no genuine issues of material fact as to those events relevant to

determining whether plaintiff was seized in a manner constituting an arrest, and because the

Court finds that plaintiff was handcuffed, searched and transported in a manner consistent with

an arrest, the Court concludes that plaintiff was arrested, and that probable cause must exist to

justify his arrest.

*B*

A reasonable arrest does not require that a suspect have actually committed a crime.

Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005) (citing Barna v. City of Perth

Amboy, 42 F.3d 809, 819 (3d Cir. 1994)).  Rather, a warrantless arrest by an officer is reasonable

where there is probable cause to believe that a criminal offense has been or is being committed.

Devenpeck v. Alford, 543 U.S. 146, 152 (2004).  Probable cause requires that the facts and

circumstances before the officer "warrant a person of reasonable caution to conclude that an

offense has been committed by the person being arrested."  Myers, 308 F.3d at 255.  Probable

cause is a "commonsense, nontechnical conception," dealing with "the factual and practical

considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

Ornelas v. U.S., 517 U.S. 690, 696 (1996) (quotation omitted).  An analysis of probable cause

requires that a court take a "totality-of-the-circumstances approach," Reedy v. Evanson, 615 F.3d

197, 211 (3d Cir. 2010) (quoting Illinois v. Gates ("Gates"), 462 U.S. 213, 230 (1983)),

evaluating both the information available to the officer as well as the urgency of the situation.

See BeVier v. Hucal, 806 F.2d 123, 127 (7th Cir. 1986) (defining probable cause as "a function

of information and exigency").  Probable cause must exist at the moment an arrest is made; an

officer may not rely on facts arising after the arrest to support a finding of probable cause.  See

Wright, 409 F.3d at 602 (finding ultimate determination of a case irrelevant to probable cause

analysis).

Whether probable cause exists is a question normally reserved for a jury:  however, "if

the evidence, viewed most favorably to plaintiff, would not support a contrary factual finding," a

court may enter summary judgment on the question of probable cause.  Estate of Smith v.

Marasco, 318 F.3d 497, 514 (3d Cir. 2003) (quoting Sherwood v. Mulvihill, 113 F.3d 396, 401

(3d Cir. 1997)).  The Court must therefore determine whether there is a genuine issue of material

fact as to whether Sexton had probable cause to arrest plaintiff or, alternatively, whether either

party is entitled to judgment as a matter of law where no contrary factual finding may be

supported.

"The validity of an arrest is determined by the law of the state where the arrest occurred."

Myers, 308 F.3d at 255.[6]  N.J.S.A. 2C:39-5b provides, in relevant part:

---

[6]In his cross motion, plaintiff notes that New Jersey law does not require an individual who holds
a valid permit to transport a weapon in a lockbox or gun case.  (Cross Motion at 16-17 (distinguishing
N.J.S.A. 2C:39-6, which permits transportation of an unlicensed weapon by lockbox as an exemption to
N.J.S.A. 2C:39-5)).  Although the Uyehara Letter suggests that the use of a lockbox is a "safer" means of
transporting the weapon (see Uyehara Letter at ¶ 6), defendants do not advance an argument that
probable cause existed to support an arrest pursuant to N.J.S.A. 2C:39-6.  See Reedy, 615 F.3d at 211
("Probable cause need only exist as to [one of the] offense[s] that could be charged under the

> Any person who knowingly has in his possession any handgun, including any antique handgun, without first having obtained a permit to carry the same as provided in N.J.S.A. 2C:58-4, is guilty of a crime of the third degree if the handgun is in the nature of an air gun . . . .  Otherwise it is a crime of the second degree.

An individual need only knowingly possess a weapon, and need not know that his possession is unlawful.  See State v. Pelleteri, 294 N.J. Super. 330, 334 (App. Div. 1996).

N.J.S.A. 2C:39-2 provides that a gun is presumed to be possessed unlawfully until a gun owner proves otherwise.  U.S. v. Valentine, 232 F.3d 350, 357 (3d Cir. 2000); U.S. v. Crandell, 509 F. Supp.2d 435, 448 (D.N.J. 2007), vacated and remanded on other grounds, 554 F.3d 79 (3d Cir. 2009); U.S. v. Booker, No. CRIM. 05-313 (JBS), 2005 WL 2217023, at *4 (D.N.J. Sept. 9, 2005), aff'd 270 Fed. Appx. 176 (3d Cir. 2008); see also U.S. v. Krabsz, Crim. No. 05-787 (JBS), 2006 WL 2528543, at *7 n.5 (D.N.J. Aug. 31, 2006) (amended opinion) (finding probable cause for evidentiary seizure of a gun found in plain view).  In practice, however, courts have expressed reluctance to apply this provision to justify an arrest or a search absent other factors.  See 270 Fed. Appx. at 179 (finding probable cause for unlawful possession based on prior conviction, "irrespective of presumption"); Valentine, 232 F.3d at 357 (expressly declining to rely on statutory presumption to justify finding of reasonable suspicion).  Rather, the absence of a valid permit is treated as an essential element of the offense of unlawful possession, and not as an affirmative defense that the defendant must prove.  State v. Ingram, 98 N.J. 489, 494-95 (1985).  But see State v. Johnson, 287 N.J. Super. 247, 269 (App. Div. 1996) (permitting jury to infer permit does not exist in absence of evidence by defendant).

---

circumstances.").

The Court finds that summary judgment as to whether Sexton had probable cause to arrest plaintiff is inappropriate because "the evidence is susceptible of different interpretations or inferences." See Ideal Dairy Farms, Inc., 90 F.3d at 744. When Sexton approached plaintiff in the parking lot of the Westmont PATCO station, he recognized the insignia on plaintiff's uniform as belonging to a private security company. Plaintiff volunteered his identification, as well as documents intended to prove his legal authority to carry a firearm in Pennsylvania and New Jersey. Through conversation with a third party, Sexton was told that plaintiff worked that day, that his shift ended at 4:15 p.m., and that he was on his way home from his place of employment. At the same time, plaintiff's NJ Permit states it is "[t]o be carried in connection w/employment as an Armed Security Guard for Wackenhut Serv. Inc.; during working hours only," and that its terms are to be observed "strictly." Sexton claims plaintiff initially told him he was on duty at the time of their interaction, but plaintiff denies this claim. Even if the Court determines that this disputed fact is not material, see Anderson, 477 U.S. at 248 (defining "material" facts in probable cause analysis pursuant to substantive law), the Court finds that a reasonable factfinder could draw different inferences and reach different conclusions based on the facts of record. A jury could conclude that plaintiff's NJ Permit should have been read literally, and that Sexton had reason to believe a crime had occurred. To be sure, however, a jury could also conclude that plaintiff's NJ Permit allowed him to carry his firearm when he commuted directly to and from work. A jury could also conclude that plaintiff's circumstance was so murky that probable cause did not exist to arrest him. A jury should therefore determine, considering the totality of the circumstances, whether probable cause existed to believe that plaintiff was in unlawful possession of his firearm.

17

Defendants rely on <u>Revell v. Port of Authority of New York and New Jersey</u>, C.A. 06-0402 (KSH), 2009 WL 901855 (D.N.J. 2009) to argue that Sexton had probable cause to arrest plaintiff for possession of a firearm without a permit.  (Defs.' Brief at 15).  That case, however, is distinguishable.  In <u>Revell</u>, the plaintiff was sidelined in New Jersey while flying from Utah to Pennsylvania.  On his flight, plaintiff had properly checked a handgun, which he stored in a lockbox.  Stranded in Newark, and unable to find another connection to his final destination, he left the airport with his bags (including the lockbox) and stayed overnight at a local hotel.  When he returned to the airport the next day, Port Authority police approached him after he passed the lockbox through a security X-ray.  The plaintiff explained the circumstances of the previous night, but asserted that the handgun was not accessible in the van that took him to the hotel.  The plaintiff, however, refused to answer whether he was legally permitted to carry a weapon in Pennsylvania (his final destination).  Port Authority police arrested the plaintiff and charged him with a violation of N.J.S.A. 2C:39-5.  The plaintiff did not possess a NJ Permit, but relied at trial on the protection given to traveling gun-owners pursuant to 18 U.S.C. § 926A (emphasis added), which states:

> Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such a firearm **if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle**:  <u>Provided</u>, That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console.

Unlike this case, because the plaintiff in <u>Revell</u> did not have a NJ Permit, it was undisputed that

he was in violation of 2C:39-5.  The question before the court was whether the Port Authority police had probable cause to believe that the plaintiff violated § 926A, which shielded him from the consequences of violating the state statute.  Revell, supra, at *5.  The court's analysis in Revell was straightforward, consistent with existing probable cause doctrine, and distinguishable from the facts in this case.  Because the plaintiff confessed to traveling with his firearm in an airport shuttle, it was reasonable for the officers to believe that the gun might have been "directly accessible" in the vehicle.  Id. at *6.  The plaintiff in Revell also confessed to staying with his firearm in a local hotel, an act which is not contemplated by § 926A and from which the police could have inferred that the weapon was "readily accessible" to him.  Id. at *7.  Unlike the Port Authority police in Revell, Sexton does not rely on any self-incriminating statements or actions by plaintiff to support a claim of probable cause.  See Wright, 409 F.3d at 603 (finding probable cause where plaintiff confessed to conduct supporting criminal charge, without requiring police to "correctly resolve conflicting evidence" to determine whether she had requisite knowledge).  In fact, all of plaintiff's actions were consistent with those of a law abiding citizen, and plaintiff gave Sexton no reason to believe that he was a threat.  See U.S. v. Garcia-Moreno, 130 Fed. Appx. 603, 606 (3d Cir. 2005) ("[A]lthough innocent behavior frequently will provide the basis for a showing of probable cause . . . in making a determination of probable cause the relevant inquiry is . . . the degree of suspicion that attaches to particular types of noncriminal acts." (quoting Gates, 462 U.S. at 243-44 n.13)).

Because the evidence may be interpreted in different ways, and because defendants cannot rely on self-incriminating conduct by plaintiff to support a finding of probable cause, the Court finds that the question of whether probable cause existed to arrest plaintiff should be

decided by a jury.  Accordingly, the Court will deny defendants' motion and plaintiff's cross motion on the issue of probable cause.

*C*

Even if it is determined that Sexton did not have probable cause to arrest plaintiff, defendants argue that Sexton should be eligible for qualified immunity.  A grant of qualified immunity depends on a two-prong test, though courts are not bound to approach the two prongs in any specific order.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).  Under the first prong, the Court must determine whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right[.]"  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Under the second prong, the Court must determine whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 202.

Because an arrest without probable cause is a clear violation of a constitutional right, the question before the Court is whether Sexton's conduct would have been clearly unlawful to a reasonable officer.  In the context of a false arrest claim, a court will not grant immunity to an officer if "on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue."  Reedy, supra, at 224 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)); see also Hunter v. Bryant, 502 U.S. 224, 228 (1991) (applying qualified immunity "if a reasonable officer could have believed [suspect's arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed").  Qualified immunity is available to an officer even in the absence of probable cause, if the officer "reasonably but mistakenly" believed that probable cause existed.  Anderson v. Creighton

20

("Creighton"), 483 U.S. 635, 641 (1987).

Qualified immunity reflects immunity from a lawsuit, not a defense to ultimate liability. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  Accordingly, courts are directed to address the question of qualified immunity "at the earliest possible stage in litigation."  Hunter, 502 U.S. at 227; id. at 228 ("Immunity ordinarily should be decided by the court long before trial."). However, the Third Circuit has recognized that a court may call upon a jury to resolve outstanding factual disputes before addressing the availability of qualified immunity.  Curley v. Klem ("Curley I"), 298 F.3d 271, 279 (3d Cir. 2002).  But see Curley v. Klem ("Curley II"), 499 F.3d 199, 211 (3d Cir. 2007) (giving courts exclusive authority to identify reasonable mistakes of law).

There are several reasons why summary judgment is not appropriate on the qualified immunity issue.  For the purpose of determining the objective reasonableness of Sexton's belief that he had probable cause to arrest plaintiff, there is a genuine issue of material fact as to whether plaintiff told Sexton he was "on duty" when Sexton first expressed suspicion about plaintiff's NJ Permit.  Whether plaintiff misstated or misrepresented the exact duration of his work day is material to determining whether Sexton reasonably believed he had probable cause when he arrested plaintiff.  Because a resolution of this dispute rests on a determination of each party's respective credibility, the Court concludes that a genuine issue of material fact exists, and the question of qualified immunity should not be decided on a motion for summary judgment.

Another reason summary judgment on the qualified immunity issue should not be decided on motion is because the record is not clear as to whether there were alternatives to plaintiff's arrest.  For example, if it was feasible for Sexton to simply confiscate plaintiff's firearm, it could

be determined that it was not objectively reasonable for Sexton to arrest plaintiff. While the Court must avoid the application of hindsight, see Ray v. Township of Warren, 626 F.2d 170, 174 (3d Cir. 2010), the Court finds that a clarification of the record and the alternatives available to Sexton is necessary to determine the availability of qualified immunity.

A third reason why summary judgment on the qualified immunity issue is inappropriate is because it could be decided that it was not objectively reasonable to arrest plaintiff until additional investigation was completed. The record is not clear at this time whether any additional investigation was feasible and if it would have been helpful. A number of cases have held that an officer's failure to adequately investigate a suspected crime evidenced an unreasonable belief in the existence of probable cause and precluded a grant of qualified immunity. See Reedy 615 F.3d at 223-24; Navarro v. City of South Gate, 81 Fed. Appx. 192, 195 (9th Cir. 2003) ("By failing to investigate material exculpatory evidence that negated an element of the offense, the officers did not consider the totality of circumstances . . . ."); Kuehl v. Burtis, 173 F.3d 646, 651 (8th Cir. 1999) (affirming denial of summary judgment on the basis of qualified immunity where officer ignored "plainly exculpatory evidence" negating required intent for commission of offense); BeVier v. Hucal, 806 F.2d at 128 (denying qualified immunity for failure to investigate whether suspected conduct was done with the requisite mental state). In these cases, the failure to investigate exculpatory evidence demonstrated that an officer did not consider the totality of the circumstances – particularly in situations where the ignored evidence would have conclusively negated an essential element of the underlying crime without hampering

or unduly delaying the investigative process.[7]  The Court therefore finds that a clarification and

further development of the information potentially available to Sexton at the time of the arrest is

necessary to determine whether qualified immunity should be applied.[8]

When Sexton approached plaintiff, he recognized the insignia on his uniform as

belonging to a private security guard company.  Plaintiff identified himself as a security guard

commuting home from duty, volunteered his identification and confirmed his employment.

Based on the present record, plaintiff did not appear to pose a threat, either to Sexton or to others

at the station.  At the same time, there are disputed facts that must be resolved by a factfinder

before the Court reaches a final conclusion as to the availability of qualified immunity.  In

addition, the Court finds that a further development and clarification of the record is necessary

before it conclusively decides the objective reasonableness of Sexton's conduct.  Accordingly,

---

[7]In Reedy, an officer believed that a gas station employee lied about being robbed and sexually assaulted in order to cover up her own theft of the station.  Reedy, 615 F.3d at 202-07.  Even though the officer investigated a factually similar robbery and assault in the months after the employee's report, and even though DNA evidence linked the two attacks, the officer charged the employee with the theft.  Id. at 207-08.  The court found that the officer's failure to compare the two attacks created "the unnecessary danger of false arrest," and reversed the district court's grant of summary judgment on the basis of qualified immunity.  Id. at 223-24.  In Navarro, officers ignored a police report suggesting that a suspect discharged his weapon in self-defense, as well as the testimony of available eyewitnesses who confirmed the report's version of events.  81 Fed. Appx. at 194.  The court found that the failure to investigate the possibility of self-defense was fatal to a finding of probable cause, because evidence of self-defense would have negated an essential element of the alleged crime.  Id. at 195.  Similarly, in Kuehl, an officer omitted the defendant's version of events from his report and refused to interview the only eyewitness on the scene.  173 F.3d at 648.  The court determined that the officer "ignored plainly exculpatory evidence that negated the intent required for [the suspected offense]."  Id. at 651.

[8]The communications with the Camden County Prosecutor's Office are not conclusive.  First, information obtained after plaintiff's arrest does not justify an arrest without probable cause.  Wright, supra.  Second, although the factfinder can consider the communications with the Prosecutor's Office, the factfinder must also determine whether the Prosecutor's Office had all relevant information when it made its recommendation.  See Kelly v. Borough of Carlisle, 622 F.3d 248, 255-56 (3d Cir. 2010) (recognizing qualified immunity for officer's reliance on prosecutor's legal opinion validating arrest, but only where the reliance is itself reasonable).

the Court denies plaintiff's cross motion arguing that qualified immunity does not apply.

*D*

Last, the Court will grant defendants' Motion for Summary Judgment as to plaintiff's claims against the DRPA. Plaintiff alleges Sexton acted "pursuant to a policy/custom" of the DRPA. (Compl. ¶ 3). Defendants argue "[p]laintiff failed to take discovery as to any DRPA policies or customs," and is therefore unable to present any evidence that the DRPA "maintained any improper policies or customs." (Defs.' Brief at 20). Plaintiff asserts he is not required to identify a specific policymaker and argues that municipal liability is a question of fact for the jury, citing Sexton's deposition testimony as evidence that "it is the established protocol of the DRPA police to never call a judge at the scene of an event." (Pl.'s Brief at 29).

Municipal liability requires that plaintiff allege and prove a constitutional injury caused by "execution of a government's policy or custom." Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 694 (1978); Santiago v. Warminster Township, 629 F.3d 121, 135 (3d Cir. 2010). "[A] prerequisite to establishing liability . . . is a showing that a policymaker was responsible either for the policy or, through acquiescence, for the custom." Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996); Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). A policymaker is an official who has "final, unreviewable discretion to make a decision or take action." Kneipp, 95 F.3d at 1213 (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1481 (3d Cir. 1990). A responsible policymaker need not be specifically identified by plaintiff's evidence, so long as plaintiff can establish "[p]ractices so permanent and well settled as to have the force of law." Bielevicz, 915 F.2d at 850 (quotation omitted).

24

To establish municipal liability, plaintiff must identify a policy promulgated by a specific policymaker, defined as "official proclamations made by a municipal decisionmaker with final authority." Kelly, 622 F.3d 248, 263 (3d Cir. 2010).  Alternatively, if plaintiff is unable to identify a specific policymaker, he may establish municipal liability by identifying a custom in the form of "practices of state officials . . . so permanent and well settled as to virtually constitute law." Id. (quoting Berg v. County of Allegheny County, 219 F.3d 261, 275 (3d Cir. 2000)) (internal quotation marks and citation omitted).  Where the record presents no explicit policy, a plaintiff may not rely solely on a single incident of police misconduct to support an inference of a municipal policy or custom.  Brown v. City of Pittsburgh, 586 F.3d 263, 292 (3d Cir. 2009) (quoting City of Oklahoma City v. Tuttle, 471 U.S. 808, 832 (1985) (Brennan, J., concurring)).

If plaintiff successfully proves the existence of a policy or custom, he must then establish that the policy or custom in question was the proximate cause of his constitutional injuries. Bielevicz, 915 F.2d at 850.  To establish proximate causation, a plaintiff must show either a "plausible nexus" or an "affirmative link" between the custom or policy at issue and the alleged constitutional injury.  Id.

Plaintiff does not specifically identify a policymaker, and the Court finds that the evidence of record is insufficient to establish the existence of any "practices so permanent and well settled as to have the force of law."  Bielevicz, supra; see also Watson v. Abington Township, 478 F.3d 144, 157 (3d Cir. 2007) (citing plaintiffs' failure to argue that alleged custom was "so widespread that a policymaker must have known about it").  The entirety of plaintiff's evidence supporting his claim for municipal liability rests on the following testimony, taken from Sexton's deposition:

| | | |
|---|---|---|
| Q. | Did Mr. Thomas ever ask you to call the judge who issued the Permit to Carry? | |
| | A. | Yes. |
| Q. | And what did you say? | |
| | A. | No. |
| Q. | And why was that? | |
| | A. | I don't contact judges on the scene. |
| . . . | | |
| Q. | [A]nd you said you don't call judges on the scene, why is that? | |
| | A. | It's not our protocol to contact the judge on the scene. |
| Q. | Okay.  Is that a written policy that you have? | |
| | A. | No. |

(Sexton Dep. Tr. 27:1-7, 27:16-24).  Sexton stated that it was not "protocol" to contact judges on

the scene, but then testified that this did not reflect a written policy.  Plaintiff has no additional

evidence to suggest that this "protocol" reflected either an official policy of the DRPA, or that it

represented a custom that was recognized and accepted by a decision-maker with final,

unreviewable discretion.  In fact, Sexton's testimony does not even reveal what he meant by the

term "protocol."  Additionally, plaintiff cannot raise an inference that an applicable custom or

policy exists at the DRPA because plaintiff's complaint is based on a single incident of alleged

police misconduct.  Further, plaintiff cannot show proximate causation because it is entirely

speculative if anything different would have occurred if Sexton called Judge Natal.  Based on the

current record, it is uncertain whether Judge Natal would have taken a call or was even available

for a call on the date in question.[9]  For the foregoing reasons, the Court will deny plaintiff's cross

motion.

**V**

In sum, on May 28, 2010, Sexton arrested plaintiff for a violation of N.J.S.A. 2C:39-5b.

The evidence of record is open to interpretation as to whether Sexton had probable cause

---

[9]The incidents in question occurred at the end of the business day on the Friday before Memorial Day.

justifying the arrest.  Similarly, and irrespective of whether probable cause actually existed,

issues of material fact must be resolved before it can be determined whether Sexton's belief that

he had probable cause was objectively reasonable such that a grant of qualified immunity is

appropriate.  Finally, the evidence of record is insufficient to support plaintiff's claim of

municipal liability against the DRPA.  Accordingly, the Court will grant the DRPA's motion for

summary judgment and deny Sexton's motion.  The Court will also deny plaintiff's cross motion.

A separate Order consistent with this Memorandum Opinion will be entered.

/s/ Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge

Dated: December 14, 2011

27